[Cite as *Cambridge Village Condominium Owners' Assn. v. State Farm Fire & Cas. Co.*, 2025-Ohio-802.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

| | |
|---|---|
| CAMBRIDGE VILLAGE CONDOMINIUM OWNERS' ASSOCIATION, INC., | CASE NO. 2024-L-063 |
| Plaintiff-Appellant, | Civil Appeal from the Court of Common Pleas |
| - vs - | |
| STATE FARM FIRE AND CASUALTY COMPANY, | Trial Court No. 2022 CV 000558 |
| Defendant-Appellee. | |

**O P I N I O N**

Decided: March 10, 2025
Judgment: Affirmed

*Stephen G. Whetstone*, Whetstone Legal, LLC, 2 North Main Street, Unit 2, P.O. Box 6, Thornville, OH 43076, and *Anthony Diulio*, Wheeler, Diulio & Barnabei, 1650 Arch Street, Suite 2200, Philadelphia, PA 19103 (For Plaintiff-Appellant).

*Lori E. Thomson*, Gallagher, Gams, Tallan, Barnes & Littrell, LLP, 471 East Broad Street, 19th Floor, Columbus, OH 43215 (For Defendant-Appellee).

EUGENE A. LUCCI, J.

{¶1} Cambridge Village Condominium Owners' Association, Inc. ("Cambridge") appeals the judgments of the trial court entering judgment in favor of State Farm Fire and Casualty Company ("State Farm") and denying Cambridge's post-judgment motions. We affirm.

{¶2} From May 22, 2020 to May 22, 2021, Cambridge was insured by State Farm under a residential community association policy. In May 2021, Cambridge filed a claim with State Farm under the policy, after a Cambridge representative found damage to

several roof shakes on Cambridge's buildings during an annual walk of the property. State Farm engaged an independent insurance adjuster to assess the claim. The adjuster spoke with an individual at Cambridge, who was unaware as to the date the damage occurred. The adjuster accessed weather reports from a website, and based upon the weather reports and damage, Cambridge and the adjuster agreed that the damage was the result of a weather event on November 15, 2020. The adjuster prepared a repair estimate, and, thereafter, State Farm approved the estimate and issued payment accordingly.

{¶3} However, Cambridge disagreed with the scope and cost of repairs contained in the adjuster's estimate. State Farm then engaged an engineer to evaluate the property, who opined the roofs were damaged by natural deterioration and deferred maintenance. Cambridge then sought to invoke an appraisal process contained in the policy, but State Farm refused to engage in the process.

{¶4} In 2022, Cambridge filed a complaint against State Farm seeking declaratory judgment for an order of appraisal. "Alternatively," Cambridge set forth a claim for breach of contract due to State Farm's failure to fully compensate it for the loss. State Farm answered the complaint, denying allegations that: Cambridge sustained a covered loss due to a wind or hail storm on November 15, 2020, State Farm had acknowledged coverage, the estimate that Cambridge submitted to it was for loss or damages caused by a storm event on November 15, 2020, and the appraisal process was applicable to Cambridge's claim.

{¶5} Thereafter, Cambridge moved to compel an appraisal pursuant to the policy, which the trial court granted. In its order granting an appraisal, the trial court stated,

2

"There is no dispute that a storm damaged some of the roof shakes of buildings belonging to Plaintiff Cambridge . . . or that Defendant State Farm . . . issued a policy to Plaintiff in place at the time of the storm that covers storm damage . . . ." The court then went on to find that the policy required the parties to submit to an appraisal and granted Cambridge's motion to compel an appraisal.

{¶6} Several disputes regarding the appraisal thereafter followed. On October 13, 2023, the trial court held a status conference. At the conference Cambridge's counsel expressed his belief that the appraisal amount was due to be paid to Cambridge. State Farm's counsel argued that the appraisal was not performed appropriately and that discovery needed to be completed on the coverage issues. When the trial court questioned State Farm's counsel about its position on coverage, counsel indicated that State Farm had issued payment on the claim prior to the dispute in an attempt to make a good faith effort to adjust the loss before engaging engineers to evaluate the damage, but coverage remained in dispute.

{¶7} In a judgment entry filed on January 17, 2024, the trial court stated:

> In the appraisal provision Defendant specifically reserves the right to deny coverage even after an appraisal is conducted. Here, Defendant disputes that there is a covered loss. Further, the alleged bias of Plaintiff's appraiser and the legitimacy of the revised appraisal are only relevant if there is a covered loss. For the sake of judicial economy, and because the parties have been unable to complete the appraisal process the last 14 months, the court hereby finds the parties shall proceed to a jury trial on April 22, 2024 on the issues of coverage and mitigation only.

(Footnote and boldface omitted.)

{¶8} Following the jury trial, the jury returned a verdict in favor of State Farm, finding that Cambridge did not prove by a preponderance of the evidence that it sustained

3

Case No. 2024-L-063

damage to its buildings on November 15, 2020, due to a wind event. The trial court entered judgment in favor of State Farm on April 24, 2024.

{¶9} On May 22, 2024, Cambridge moved for judgment notwithstanding the verdict pursuant to Civ.R. 50(B), or, alternatively, a new trial pursuant to Civ.R. 59. On August 8, 2024, the trial court issued a judgment denying Cambridge's motion. Cambridge now appeals, assigning four errors for our review.[1] We address Cambridge's assigned errors out of order to facilitate our discussion.

{¶10} In its third and fourth assigned errors, Cambridge maintains:

> [3.] The Trial Court committed a reversible error by allowing Appellee to argue at trial that Appellant's building was not damaged, where Appellee waived, or, in the alternative, was equitably estopped from asserting such argument after issuing a payment acknowledging coverage.

> [4.] The Trial Court committed reversible error by failing to take judicial notice of the damage to Appellant's property where the existence of damage to Appellant's property was not a disputed fact between the parties throughout the first two years of Appellant's claim and litigation.

{¶11} We initially note that, in its stated third and fourth assigned errors, Cambridge maintains that the trial court erred in allowing State Farm to argue that there was no damage to Cambridge's property, or in failing to take judicial notice of the existence of damage. However, the parties' dispute does not appear to have involved whether there existed damage to the property, but, instead, pertained to whether the damage was "covered" under the State Farm policy. We direct our discussion accordingly.

---

1. As applicable here, App.R. 4(B)(2) provides that when timely and appropriate motions for judgment under Civ.R. 50(B) and for a new trial under Civ.R. 59 are filed, the time for appeal is tolled until the trial court enters an order resolving the last of the post-judgment filings.

4

Case No. 2024-L-063

{¶12} In its third assigned error, Cambridge argues that State Farm waived its argument that the damage was covered, or, in the alternative, State Farm was equitably estopped from asserting such an argument. In its fourth assigned error, Cambridge argues that the trial court should have taken judicial notice that the damage was covered. State Farm responds that Cambridge "waived" these arguments for purposes of appeal because it did not timely raise the arguments on the record.

{¶13} The "failure to timely advise a trial court of possible error, by objection or otherwise, results in a [forfeiture] of the issue for purposes of appeal." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 1997-Ohio-401; *State v. Payne*, 2007-Ohio-4642, ¶ 23 (explaining the differences between "waiver" and "forfeiture" of an argument). Where no objection is made in the trial court, a party's argument on appeal is limited to instances of plain error:

> In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.

*Goldfuss* at syllabus.

{¶14} Here, as set forth in our recitation of the procedural history, in its January 17, 2024 order, the trial court specifically set this matter for trial on the issue of coverage. Cambridge proceeded to trial without raising the issues of waiver or estoppel with respect to coverage. Further, although the trial court stated in the order compelling an appraisal that there was no dispute regarding coverage, apparently based on the status of the litigation at that time, it did not take "judicial notice" that the damage was covered, nor did

5

Case No. 2024-L-063

Cambridge request the court to do so. Accordingly, we agree with State Farm that Cambridge's arguments regarding these issues, which Cambridge first raised in its post-judgment motion, were not "timely" made, i.e., made "at a time when the alleged error could have been corrected . . . ." *Goldfuss* at 121.

{¶15} Therefore, Cambridge forfeited the arguments raised in its third and fourth assigned errors. Cambridge has not advanced a plain error argument on appeal, and we can discern no "exceptional circumstances" presented in this case that would warrant application of the plain error doctrine.

{¶16} Accordingly, Cambridge's third and fourth assignments of error lack merit.

{¶17} In its first assigned error, Cambridge argues:

> The Trial Court committed reversible error by improperly charging the jury, because it based its verdict sheet on an erroneous legal standard, namely, placing the burden on Plaintiff to prove the cause and specific date of damage, rather than properly placing the burden on Defendant to prove the applicability of an insurance exclusion.

{¶18} In its first assigned error, Cambridge challenges the following jury instruction: "The only issue you are to decide is whether Plaintiff has proven by a preponderance of the evidence that it sustained damage to its building or buildings on November 15, 2020 due to a wind event on that date." Cambridge further challenges the verdict form, which likewise set forth, "We, the jury, having been duly empaneled, sworn, and affirmed, hereby find that Plaintiff Cambridge Village Condominium Owners' Association, Inc. (*)_____ prove by a preponderance of the evidence that it sustained damage to its building or buildings on November 15, 2020 due to a wind event on that date. (*Insert in ink ('DID' or 'DID NOT')[.]" Cambridge maintains that this

6

instruction and the verdict form incorrectly stated its burden with respect to causation and the date of loss.

{¶19} "'It is undisputed that one seeking to recover on an insurance policy generally has the burden of proving a loss and demonstrating coverage under the policy.'" *Sharonville v. Am. Employers Ins. Co.*, 2006-Ohio-2180, ¶ 19, quoting *Inland Rivers Serv. Corp. v. Hartford Fire Ins. Co.*, 66 Ohio St.2d 32, 34 (1981). However, an insurer bears the burden of establishing the applicability of a policy exclusion as an affirmative defense. *Continental Ins. Co. v. Louis Marx & Co., Inc.*, 64 Ohio St.2d 399, 401 (1980).

{¶20} Here, there is no dispute that the policy was in effect from May 22, 2020 through May 22, 2021. The policy provides that State Farm would "insure for accidental direct physical loss to Covered Property unless the loss is: 1. Excluded in Section I – EXCLUSIONS; or 2. Limited in the Property Subject to Limitations provision." (Boldface omitted.). Cambridge argues it "satisfied its burden by showing that it sustained a loss, i.e., property damage, during the insured period. At that point, the burden should have shifted to Appellee, who should have had the burden of demonstrating that the loss was excluded from coverage under the policy."

{¶21} Cambridge maintains that it had submitted proposed jury instructions to the trial court that "accurately reflect[ed] the burden-shifting nature of insurance coverage law in Ohio. Appellant proposed, *inter alia*, the following instruction: 'While the plaintiff has the burden of proving damage to its property, the burden then shifts to Defendant to prove, by a preponderance of the evidence, that the exclusion applies.' (T.d. 159)." However, Cambridge's citation to the record directs this court to a docket notation which states,

7

"04/17/24 Document submitted for consideration (not filed)[.]" Thus, Cambridge's proposed jury instructions were not preserved in the record.

{¶22} Nonetheless, the trial court discussed the jury instructions with counsel on the record. State Farm maintains that Cambridge waived the arguments it advances on appeal because it failed to object to the instructions in accordance with Civ.R. 51(A), which provides, "On appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury." State Farm further maintains that, through the discussions on the instructions, Cambridge affirmatively agreed to the instruction ultimately given.

{¶23} The trial court first discussed the jury instructions with counsel after Cambridge rested its case. Regarding the particular instruction at issue on appeal, the trial court agreed to remove a reference to "hail." Prior to resuming trial the next day, the court and counsel discussed the revised instructions, at which point a lengthy exchange between the court and Cambridge's counsel ensued regarding the inclusion of the date of the storm. Cambridge's counsel indicated that, if State Farm's witnesses were to testify that the damage was caused by a different event that occurred during the policy period, the damages would nonetheless constitute a covered loss. Counsel for State Farm responded that the date alleged as the basis for damage was essential to Cambridge's claim, because there existed a two-year window to initiate a lawsuit for the loss, the complaint specifically alleged a loss on November 15, 2020, and losses from other events

8

would constitute separate claims, subject to separate deductibles. The court indicated that it would "see where it goes."

**{¶24}** Thereafter, State Farm presented no evidence of other events occurring during the policy coverage period, and its expert opined that the damage to the roofs resulted from normal deterioration and deferred maintenance.

**{¶25}** After State Farm rested, the following exchange occurred between the court and counsel:

> [COUNSEL FOR CAMBRIDGE]: Yes, one thing, Your Honor. Just given the testimony candidly I don't think we need much change to the verdict sheet but I have two things to point out. For the verdict sheet is the Court okay with that it sustained damage to its building or buildings.
>
> In essence, Your Honor, as written it seems to imply that there needs to be damage to multiple buildings for a finding in favor of the plaintiff. I don't believe that is the intent of the Court and we'd just ask for that change.
>
> THE COURT: Miss Thomson [(counsel for State Farm)].
>
> [COUNSEL FOR STATE FARM]: I mean they're claiming it's all the buildings but it's up to the Court, I don't have a preference.
>
> THE COURT: Well, I mean they can find it's one building --
>
> [COUNSEL FOR STATE FARM]: One, yeah.
>
> THE COURT: -- or it's all of them so we'll change it to building, from building or buildings.
>
> [COUNSEL FOR CAMBRIDGE]: I appreciate that, Your Honor.

Thus, it appears that Cambridge acquiesced in the final version of the instructions and verdict sheet.

9

Case No. 2024-L-063

**{¶26}** Nonetheless, Cambridge maintains it preserved this issue for appeal because it fully apprised the court of the correct law when, during the first discussion of the instructions, Cambridge stated: "But when it comes to the actual burden you know the defense is for an exclusion of the policy. It's not for us to prove the actual cause of losses. Our only burden is to prove accidental direct loss." *See State v. Wolons*, 44 Ohio St.3d 64 (1989), syllabus; and *Presley v. Norwood*, 36 Ohio St.2d 29, 33 (1973) ("where the record affirmatively shows that a trial court has been fully apprised of the correct law governing a material issue in dispute and that the complaining party has unsuccessfully requested the inclusion of that law in the trial court's charge to the jury, that party cannot be said to have waived his objections to the court's charge by failing to formally object after the charge is given").

**{¶27}** However, counsel for Cambridge made this statement as part of Cambridge's argument that, if State Farm were to present evidence of other events during the policy period, then the date of November 15, 2020 should be changed to the dates of the policy period. As set forth above, State Farm did not present evidence of other events occurring during the policy period, and Cambridge did not request the court to remove "due to a wind event" from the instructions or the verdict form.

**{¶28}** From the discussion between the court and Cambridge regarding the instructions, we conclude that Cambridge not only failed to object to the instructions, it affirmatively agreed to the instructions with modifications that the court made. *See Payne*, 2007-Ohio-4642, at ¶ 23-24 (where an appellant has waived, as opposed to forfeited, an objection, the appellant cannot assign error to the waived objection).

**{¶29}** Accordingly, Cambridge's first assigned error lacks merit.

10

{¶30} In its second assigned error, Cambridge contends:

The Trial Court committed a reversible error by confirming a jury verdict that was "manifestly against" the weight of the evidence, as Defendant-Appellee's own roofing expert and representative determined there was wind damage from this storm and its engineering expert testified that it was both "reasonable" and "probable" that the November 15, 2020 storm caused damage, and Defendant-Appellee failed to present any additional evidence to refute storm-caused damage.

{¶31} In its second assigned error, Cambridge maintains that the jury's determination that it did not sustain damage to its property on November 15, 2020, due to a wind event, was against the manifest weight of the evidence. "A challenge to the manifest weight of the evidence requires an appellate court to review the evidence presented 'including the reasonable inferences and the credibility of the witnesses, to determine whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the decision must be reversed.'" *Straight v. Straight*, 2020-Ohio-4692, ¶ 24 (11th Dist.), quoting *Chandler v. Chandler*, 2017-Ohio-710, ¶ 13 (11th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. "The weight to be given evidence and witness credibility are primarily for the trier of fact." (Citation omitted.) *Straight* at ¶ 25. "The trier of fact is free to believe all, part, or none of a witness'[ ] testimony." (Citation omitted.) *Id.*

{¶32} After review of the evidence admitted at trial, we first note that the record is incomplete. As its first witness, Cambridge played a video deposition of an individual named Dillon Turner. However, Turner's deposition was not transmitted with the record on appeal. On the parties' joint motion, on December 27, 2024, the trial court ordered the record be supplemented with the transcript of Turner's deposition instanter. However, the

11

transcript was not filed, and the trial court later vacated the December 27, 2024 order. From the references to Turner's testimony throughout trial, it appears he testified at length as to the November 15, 2020 windstorm.

{¶33} Despite the absence of Turner's testimony, there is no dispute that there existed a severe windstorm on November 15, 2020, and we proceed to review the remaining evidence as it pertains to the jury's determination that Cambridge failed to prove it suffered loss on this date.

{¶34} After the video testimony of Turner, Cambridge provided the testimony of Harry Frank, who worked as the property manager for Cambridge for 20 years. Frank testified that, every year, between the middle of April and the beginning of June, he conducted an annual walk of the property. When he did so in 2021, Frank observed shakes missing from the roofs and gutter issues, and he reported the claim to State Farm. At that time, he did not know when the loss occurred.

{¶35} Wade Thomas Lingenfelter then testified as an expert in building and consulting. Lingenfelter maintained that Cambridge's buildings were damaged by wind and hail. Lingenfelter stated that he heard the testimony of Turner, who apparently maintained that the November 15, 2020 storm did not produce hail. However, Lingenfelter opined that the wind damage resulted from the November 15, 2020 storm. On cross-examination, Lingenfelter testified he had no role in determining a date of damage.

{¶36} Eric Trillas next testified as an expert in forensic engineering. Trillas evaluated the property and observed wind and hail damage. Trillas explained that his opinion of wind damage was based on evidence that wind had lifted the roofing membrane. In addition, the difference in color on the wood indicated a recent event, as

12

Case No. 2024-L-063

the wood was not worn to the same extent. The following exchange occurred on direct examination:

> Q. Now, here's one of the real important questions. Do you have an opinion as to what storm caused that damage?
>
> A. Yes. So I'm not going to sit here and tell you that I walked up and saw this and said immediately it was November 2020 or any other date.
>
> Q. What did you do?
>
> A. So what we do is we document everything. We talked about the photos, take over 5,000 photos that at (sic.) we had, take it back to the office, I evaluate that, compare it to all the other facts that we have. And so we pulled weather data we have dating back to 2010 for this specific area.
>
> So we know the type of damage that we have, right. We are, it is clear that it's wind damage, that's clear. That's the only thing clear about when you first see it.
>
> Now how do you tie it to a specific date. So once you understand that it's wind damage you got to find what type of wind, what can cause that type of damage. Understanding the forces and how they act on these type of members (sic.). So then we did a history of the weather dating back to 2010. We found the exact dates of the types of wind speeds that this property would have experienced high wind pressures that could have caused this type of damage. That narrows it down to a handful of dates.
>
> Then we start looking at the appearance of the damage compared to the dates of those weather events, looking at that so by the appearance, I mean discoloration, the aging, et cetera. Once you compare that to the dates of the weather data that we had and the facts of the case that we had from the gentlewomen and the gentlemen that we spoke to indicated they saw damage on certain dates, the photos that we saw that were taken by others that were there prior to us kind of taking the damage of the specific dates and we were able to come to a conclusion it was the November 2020 storm that caused this type of damage.

13

Case No. 2024-L-063

Q. So let's break this down a little bit. We've got a storm of nearly 70 miles an hour on November 15, 2020. In your analysis of looking back at the weather how long before November 15th, 2020, how far back do you have to go before you get to a storm that you determined could have caused any type of wind damage to this property?

A. So based on the NOAA weather data that we pulled from the National Weather Service we found that the only other significant wind event that occurred at the property or in the vicinity of the property that NOAA has on record public[ly] is a 2018 storm and if I'm not mistaken, I'm going from memory, I believe it was September of 2018.

Trillas indicated that there was "no doubt in his mind" that the November 15, 2020 storm caused wind damage to Cambridge's property.

{¶37}   On cross-examination, Trillas confirmed that he reviewed the NOAA storm database from 2010 to shortly past 2020. State Farm's counsel showed Trillas a search result from that database, which indicated two wind events in 2019. Trillas stated that the wind speeds of those storms were significantly slower than the 70 miles per hour wind speed that occurred during the November 15, 2020 storm. Trillas explained:

Lesser miles per hour cause what we saw were 70 miles per hour and when you're looking at pressures of buildings the formula to determine what pressure a building gets is squared so it's exponentially greater for every mile going up. So if we're looking at, for instance we're looking at roughly the two events we saw were 60 miles per hour. The difference in pressures between 60 to 70 miles per hour is exponential so you are talking about a roughly around 25 percent increase in pressures on a building over simply just 10 miles per hour. I understand that 10 miles per hour seems like not much but in engineering and the forces on a building it is exponentially greater.

{¶38}   Following Trillas' testimony, Cambridge rested.

{¶39}   For the defense, State Farm first called Matt Mercer, a forensic structural engineer, recognized as an expert by the court. Mercer testified that he inspected the

14

property for State Farm. He determined, "So in general again no portion of the roof of any of the subject buildings that includes both the cedar shakes and the flat roofs was damaged by wind. Multiple building roofs had widespread aged and deteriorated repairs. The majority of the buildings had isolated depreciations that caused water to pool on or on top of the roof." Mercer explained that for "the vast majority of the shakes that were detached or fractured there was severe rotting." Mercer opined:

> The general condition of the shakes widespread splitting, cupping, curling, section loss, all of these render a cedar shake weak to just general conditions. Such deterioration can occur to such a degree that splitting occurs or enough deterioration that the shingle will just fall off from the exterior stresses. As far as identifying how there was no specific damage on, attributable to the November 15th, 2020 event, first and foremost there was no documentation of any such damage. Part of our process is to review all available documentation. A request was made and none such was provided. There's no documentation of a very freshly, or no large group of freshly displaced shakes, not even a single shake that was represented through any type of physical evidence as being displaced due to that or as a direct result of that November 15th event.

> What I did find is that there was, there was however physical evidence of kind of a continued process of shakes detaching from the roofs and that's on all of the buildings. The way we can establish this is a brand new cedar shake roof, you know wood that has never been exposed to the elements is generally very bright in color. Over time with exposure to elements it does begin to wear and it's kind of that service life, limited service life.

{¶40} Mercer maintained that there exists no precise protocol to ascertain from the discoloration of the roof how long a shake has been missing. However, he determined that the discoloration here indicated that "displacement and shifting of all of these shakes has been a progressive process that's developing over time." As to the flat roofs, he noted, "So much like the cedar shakes the low slope we refer to them roof systems were severely

15

deteriorated, deferred maintenance, improper repairs, significant water ponding, all conditions generally attributable to again that age related deterioration and deferred maintenance."

{¶41} On cross-examination, the following exchange occurred between counsel for Cambridge and Mercer:

> Q. Now sitting here today you are not disputing that the November 15th, 2020 storm blew off some shingles from this property, correct?
>
> A. I have no direct evidence to support that or refute it.
>
> Q. It would be reasonable, within a reasonable degree of certainty in engineering that the storm with 60 to 70 mile an hour winds blew some of the these (sic.) older shingles off of the property, correct? You don't know if it was 1, 2, 10, 50 but at least some shingles were blown off as a result of this storm, correct?
>
> A. So there was evidence to suggest a progressive dropping or detachment of shakes. The reason --
>
> Q. I hate to stop you but I'm specifically talking about this storm.
>
> A. Which I'm getting to.
>
> Q. So this storm blew some shingles off this property whether it be 1, 5 or 20, we don't know, I recognize that but this storm blew something off of this property, correct?
>
> A. So as I was saying the progressive nature of the deterioration that multiple shakes were falling or detaching from the roof over the course of time.
>
> Q. Mr. Mercer --
>
> A. Some percentage of time --
>
> THE COURT: Hold on, hold on, listen to his question.

16

Q. Mr. Mercer, I'm asking a very specific question not about the shingles that fell off before or after, I'm asking specifically about this storm. As a result of this storm given the condition of the shingles, everything else we know, this storm blew some of those shingles off the property whether it be 1, 5 or 15, correct?

A. There was some potential for that but no evidence to substantiate it specifically.

Q. So you just don't know how many but there's at least, is it reasonable to say that this storm blew off some level of shingles, correct?

A. There's a probability of it.

Q. It (sic.) probable?

A. There is a probability.

Q. Okay. Let me ask it a different way. Given the probability that some of the shingles fell off, the ones that would have fallen off during this storm wouldn't have fallen off on that date at that time but for the storm; you agree with me on that, correct?

A. Again I have no physical evidence to substantiate that any of them had, so I wouldn't know the specific condition of those shakes.

Q. You said there's a probability that they fell off as a result of the storm but you don't know with any level of certainty; is that right?

A. That's fair.

Q. Okay. So if your probabilities are correct and some of these shingles fell off they wouldn't have fallen off at this time on that date but for the wind. They might have fallen off a week, ten weeks, ten years later but that day that time was because of the wind, correct?

A. There's a possibility.

Q. A probability I think is what you said, correct?

17

Case No. 2024-L-063

A. Both, sure.

Q. It's probable?

A. I would say it (sic.) reasonable.

{¶42} After Mercer's testimony, State Farm called Mark Honas who testified that he is an independent insurance adjuster. He inspected Cambridge's property for State Farm regarding this claim. When he arrived, he spoke to a Cambridge representative at the property about the date of loss, but that individual was unaware as to the date the damage occurred. Honas testified that he then accessed a weather report, and the Cambridge representative and he agreed that November 15, 2020 would have been the date of loss. During his inspection, Honas included in his report any damage that appeared could arguably be damage resulting from that storm. After Cambridge disputed the repairs and an engineer was assigned, Honas had no further involvement with this claim.

{¶43} On cross-examination of Honas, the following exchange occurred:

Q. And when you went out to the property there was no doubt in your mind that this property sustained wind damage from the November 15th, 2020 storm, correct?

A. I had no reason to doubt from the property owner that there was no damage there.

Q. And that was consistent with what you found when you went in and inspect (sic.) it, correct?

A. I found damage that I thought was related to that date of loss.

{¶44} Following Honas' testimony, State Farm rested. Thereafter, the jury returned its finding that Cambridge had not demonstrated by a preponderance of the

18

evidence that damage to its property occurred on November 15, 2020, as a result of a wind event.

{¶45} After review, we cannot say this finding is against the weight of the evidence. Cambridge relied on the November 15, 2020 windstorm to argue that the date of loss was within the policy period. However, the jury was free to believe State Farm's expert, who, although acknowledging that it was "probable" or "reasonable" that some amount of damage occurred as a result of the windstorm, could locate no particular damage that he could attribute to the storm. We cannot say that this is the exceptional case where the evidence weighs heavily in Cambridge's favor.

{¶46} Accordingly, Cambridge's second assigned error lacks merit.

{¶47} The judgment is affirmed.

ROBERT J. PATTON, P.J.,

MATT LYNCH, J.,

concur.

Case No. 2024-L-063